NIGHT BOX
FILED

SEP 06 2000

CLERK, USDC / SDFL / WPB

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 00-6211-CR-HURLEY

UNITED STATES OF AMERICA          )
                                  )
v.                                )
                                  )
RABAH EL HADDAD                   )
                                  )
_____   )

UNDERLINE NOTICE OF FILING

The United States of America, by and through undersigned counsel, hereby gives notice of filing the attached transcript of the detention hearing on August 29, 2000, before Magistrate Judge Bandstra. This transcript is submitted in support of the Government's August 29, 2000, Appeal of Magistrate Judge Bandstra's Denial of the Government's Request for Pretrial Detention.

Respectfully submitted,

GUY A. LEWIS
UNITED STATES ATTORNEY

By: _____
LAURENCE M. BARDFELD
Assistant U.S. Attorney
500 East Broward Blvd., #700
Ft. Lauderdale, Florida  33394
(954) 356-7255, Fax: 356-7228
Fla. Bar No. 712450
E-Mail:Laurencebardfeld@justice.usdoj.gov

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was mailed/hand-delivered this _6th_ day of September, 2000, to: Howard Srebnick, Esquire, 201 South Biscayne Boulevard, Suite 1300, Miami, FL 33131.

LAURENCE M. BARDFELD
ASSISTANT U.S. ATTORNEY

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

THE UNITED STATES OF AMERICA, )
                                  )          CASE NUMBER
              PLAINTIFF,       )          00-6211-CR-HURLEY
                                    )
       VS.                          )
                                    )
RABAH EL HADDAD,              )          THIS VOLUME:
                                    )          PAGES 1 - 29
              DEFENDANT.      )
_____)

### (TRANSCRIPT BY TAPE)

TRANSCRIPT OF PRETRIAL DETENTION HEARING HAD BEFORE THE HONORABLE TED E. BANDSTRA, IN MIAMI, MIAMI-DADE COUNTY, FLORIDA, ON AUGUST 29, 2000, IN THE ABOVE-STYLED MATTER.

APPEARANCES:

FOR THE GOVERNMENT:    LAURENCE BARDFELD, A.U.S.A.

FOR THE DEFENDANT:    HOWARD M. SREBNICK, ESQ.

CARL SCHANZLEH
OFFICIAL COURT REPORTER
U. S. COURTHOUSE
299 E. BROWARD BLVD., 202B
FORT LAUDERDALE, FLORIDA 33301
954 769-5488

1   (MIAMI, MIAMI-DADE COUNTY, FLORIDA;  AUGUST 29, 2000, IN

2   OPEN COURT.)

3            THE CLERK:  THE UNITED STATES OF AMERICA VERSUS

4   RABAH EL HADDAD, CASE NUMBER 00-6211-CRIMINAL-HURLEY.

5            MR. BARDFELD:  GOOD MORNING, YOUR HONOR, LARRY

6   BARDFELD FOR THE UNITED STATES.

7            THE COURT:  I'M SORRY, I MISSED YOUR LAST NAME,

8   SIR?

9            MR. BARDFELD:  LARRY BARDFELD.

10           THE COURT:  ALL RIGHT.

11           MR. SREBNICK:  GOOD MORNING, YOUR HONOR, HOWARD

12  SREBNICK, TEMPORARY ATTORNEY, ON BEHALF OF RABAH EL HADDAD

13  WHO IS BEFORE THE COURT.

14           HAS YOUR HONOR RECEIVED MY MOTION FOR PRETRIAL

15  RELEASE?

16           THE COURT:  YES, AND I HAVE ACTUALLY READ IT,

17  MR. SREBNICK, SO AT LEAST WE HAVE DONE THAT.

18           ALL RIGHT.  WE ARE HERE FOR A PRETRIAL DETENTION

19  HEARING.  I BELIEVE FROM WHAT I'M READING IN MR. SREBNICK'S

20  RESPONSE THERE WAS A PREVIOUS HEARING, ALTHOUGH I UNDERSTAND

21  THE FAMILY WAS NOT THERE, AND SO FORTH, BUT WE ARE HERE FOR

22  A PRETRIAL DETENTION HEARING.

23           IS THAT RIGHT, MR. BARDFELD?

24           MR. BARDFELD:  THAT IS CORRECT, YOUR HONOR.

25           HOWEVER, AGAIN, AS I SAID TO JUDGE TURNOFF, I

1  DON'T BELIEVE THE DEFENDANT IS ENTITLED TO ANOTHER HEARING

2  PURSUANT TO 3145(B).  IT IS MY UNDERSTANDING THAT THE

3  APPROPRIATE COURSE OF ACTION WOULD BE TO APPEAL TO THE

4  DISTRICT COURT JUDGE OF ANY HEARING HE HAD.

5          HAVING SAID THAT --

6          THE COURT:  WHAT DID JUDGE TURNOFF SAY TO THAT?

7          MR. BARDFELD:  JUDGE TURNOFF SAID THAT HE WAS

8  GOING TO HAVE A HEARING AND GIVE IT TO YOU.

9          THE COURT:  I DON'T KNOW -- I KNOW WHAT ISSUE YOU

10 ARE RAISING, I DON'T KNOW THE ANSWER TO IT.  I THINK THAT --

11 ARE YOU PREPARED TO PROCEED THIS MORNING?

12         MR. BARDFELD:  YES, YOUR HONOR.

13         THE COURT:  LET'S PROCEED WITH IT, AND PERHAPS YOU

14 ARE RIGHT THAT IT SHOULD BE ON APPEAL TO THE DISTRICT JUDGE

15 BUT I HAVE A FEELING THE DISTRICT JUDGE WOULD PROBABLY SEND

16 IT BACK FOR A HEARING AT THIS -- IN THIS COURT ANYWAY SO

17 LET'S DO THAT.

18         MR. BARDFELD:  I UNDERSTAND.

19         HAVING SAID THAT, MAY I APPROACH?

20         I HAVE A COPY OF GOVERNMENT'S EXHIBIT NUMBER 1,

21 WHICH IS A COPY OF THE ORDER FROM THE NORTHERN DISTRICT OF

22 CALIFORNIA.

23         THE COURT:  ALL RIGHT.  YOU MAY HAND IT TO ME.

24         (DOCUMENT TENDERED)

25         THE COURT:  WHY DON'T YOU START US BACK AT THE

1   BEGINNING, MR. BARDFELD, AND SUMMARIZE THE CHARGES, THE

2   EVIDENCE, AND THE BASIS OF THE REQUEST.

3           MR. BARDFELD:  YES, YOUR HONOR.

4           THE DEFENDANT, RABAH EL HADDAD, AND 13

5   CODEFENDANTS ARE CHARGED BY WAY OF INDICTMENT WITH

6   CONSPIRACY TO POSSESS AND DISTRIBUTE PSEUDOEPHEDRINE, A LIST

7   ONE CHEMICAL, KNOWING AND HAVING REASONABLE CAUSE TO BELIEVE

8   THAT THE LISTED CHEMICAL WOULD BE USED TO MANUFACTURE A

9   CONTROLLED SUBSTANCE, THAT IS, METHAMPHETAMINE, A SCHEDULE

10  TWO CONTROLLED SUBSTANCE.

11          IN ADDITION TO THE CONSPIRACY COUNT THIS DEFENDANT

12  IS CHARGED IN TWO SUBSTANTIVE COUNTS OF POSSESSION AND

13  DISTRIBUTION OF PSEUDOEPHEDRINE.  THIS IS ALL IN VIOLATION

14  OF TITLE 21, UNITED STATES CODE, SECTION 841(D)(2) AND 846.

15          BEGINNING IN OR AROUND SEPTEMBER OF 1999, THOMAS

16  NAROG, THE LEAD DEFENDANT IN THIS CASE, BEGAN RECEIVING

17  EXTRAORDINARILY LARGE SHIPMENTS OF PSEUDOEPHEDRINE FROM DRUG

18  MANUFACTURERS IN NEW YORK.  MR. NAROG IS THE ONLY EMPLOYEE

19  OF SEASIDE PHARMACEUTICALS, A RECENTLY FORMED

20  PHARMACEUTICALS COMPANY IN SOUTH FLORIDA.  THE COMPANY HAS

21  NO OFFICE AND EXISTS ONLY AS THREE SEPARATE STORAGE UNITS AT

22  A PUBLIC STORAGE FACILITY.

23          MR. NAROG IS THE ONLY PERSON INVOLVED IN THIS

24  INDICTMENT WHO CAN OBTAIN THE PSEUDOEPHEDRINE FROM THE

25  MANUFACTURERS BECAUSE HE IS THE ONLY DEA REGISTRANT AMONGST

1   THE DEFENDANTS.

2          PSEUDOEPHEDRINE IS AN OVER-THE-COUNTER COLD

3   MEDICINE THAT IS NOT ILLEGAL TO POSSESS OR DISTRIBUTE.

4   HOWEVER, IT IS A PRECURSOR TO METHAMPHETAMINE AND IT IS USED

5   TO MANUFACTURE METHAMPHETAMINE USUALLY IN CLANDESTINE LABS

6   IN THE WESTERN PART OF THE COUNTRY.

7          IN THIS PARTICULAR CASE, THE DEFENDANTS WERE IN

8   POSSESSION OF MASSIVE QUANTITIES OF PSEUDOEPHEDRINE PILLS.

9   ON THREE SEPARATE OCCASIONS MR. EL HADDAD AND A CODEFENDANT,

10  MOHAMMED SAMHAN, RECEIVED SHIPMENTS OF PSEUDOEPHEDRINE FROM

11  THE LEAD DEFENDANT THOMAS NAROG.  THE PSEUDOEPHEDRINE WAS

12  DRIVEN TO MIAMI WHERE EL HADDAD AND SAMHAN REPACKAGED IT AND

13  THEN SHIPPED IT TO THE WEST COAST.  THE SHIPPING PACKAGES

14  WERE LABELED AS BOOKS, SHAVERS OR SHOES BUT NOT AS

15  PSEUDOEPHEDRINE OR MEDICINE.

16         MR. EL HADDAD TRAVELED TO CALIFORNIA AND OREGON

17  WHERE THE PSEUDOEPHEDRINE WAS BEING SHIPPED TO MAKE CERTAIN

18  THE SHIPMENT OF PSEUDOEPHEDRINE MADE ITS INTENDED

19  DESTINATION, BECAUSE NUMEROUS SHIPMENTS OF THE

20  PSEUDOEPHEDRINE BY OTHERS INVOLVED IN THIS CONSPIRACY WERE

21  INTERCEPTED BY LAW ENFORCEMENT OFFICIALS ON THE WEST COAST.

22         WHEN MR. EL HADDAD WAS ARRESTED IN CALIFORNIA

23  AFTER HE HAD TRAVELED TO THE WEST COAST TO FOLLOW A

24  SHIPMENT, HE WAS FOUND IN POSSESSION OF 220 POUNDS OF LOOSE

25  PSEUDOEPHEDRINE PILLS.  PURSUANT TO A CONSENT SEARCH OF

1    CODEFENDANT SAMHAN'S RESIDENCE, ALMOST 150 POUNDS OF LOOSE

2    PSEUDOEPHEDRINE WAS FOUND.

3         ADDITIONALLY, A TOTAL OF CLOSE TO 3,000 GROSS

4    POUNDS, WHICH WOULD BE THE EQUIVALENT OF 300 POUNDS OF

5    NOTHING BUT LOOSE PILLS OF PSEUDOEPHEDRINE WAS SHIPPED BY

6    MR. EL HADDAD AND MR. SAMHAN TO THE WEST COAST ON OTHER

7    OCCASIONS, SOME OF WHICH WAS SEIZED BY LAW ENFORCEMENT

8    OFFICIALS AND SOME OF WHICH AVOIDED DETECTION.

9         NOW, IT IS THE GOVERNMENT'S POSITION THAT THE

10   DEFENDANT IS A RISK OF FLIGHT AND A DANGER TO THE COMMUNITY.

11   WE WOULD RELY ON THE REBUTTABLE PRESUMPTION.  IT DOES APPLY

12   IN THIS CASE BECAUSE THE DEFENDANT IS FACING A STATUTORY

13   MAXIMUM OF 20 YEARS.

14        THE BASE LEVEL OFFENSE IN THIS CASE WOULD BE A

15   BASE LEVEL OF 30.  ANYTHING OVER 20 KILOGRAMS OR 44 POUNDS

16   WOULD BE A LEVEL 30, THAT'S AS HIGH AS IT GOES, AND THIS

17   DEFENDANT WAS IN POSSESSION OF OVER 220 POUNDS HIMSELF WHEN

18   HE WAS ARRESTED, HIS CODEFENDANT WAS IN POSSESSION OF 150

19   POUNDS, AND THAT'S IN ADDITION TO FIVE TIMES THAT AMOUNT BY

20   OTHER DEFENDANTS IN THIS CASE, BUT I'M JUST FOCUSING ON THIS

21   PARTICULAR DEFENDANT.

22        THE DEFENDANT IS LOOKING AT, AT LEAST 97 TO 121

23   MONTHS IN PRISON.

24        SPECIFICALLY AS TO THE FACTS.  BETWEEN SEPTEMBER

25   OF 1999 AND JUNE OF 2000, THOMAS NAROG AT SEASIDE

1  PHARMACEUTICALS IN SOUTH FLORIDA RECEIVED APPROXIMATELY

2  36,000 GROSS POUNDS OF PSEUDOEPHEDRINE.

3         SINCE THE PSEUDOEPHEDRINE WAS DELIVERED TO SEASIDE

4  PHARMACEUTICAL, WHICH EXISTS ONLY AS THE STORAGE WAREHOUSE,

5  AGENTS COORDINATED SEVEN CONTROLLED DELIVERIES OF THE

6  PSEUDOEPHEDRINE IN CALIFORNIA AND OREGON AND OTHER PLACES IN

7  THE WEST.  THE PSEUDOEPHEDRINE HAD BEEN DELIVERED TO

8  CLANDESTINE METHAMPHETAMINE LABS WHERE IT WAS BEING USED TO

9  MANUFACTURE METHAMPHETAMINE.

10        SPECIFICALLY, THREE OF MR. NAROG'S SHIPMENTS OF

11  PSEUDOEPHEDRINE WERE RECEIVED BY MR. EL HADDAD AND

12  MR. SAMHAN AND THEN SHIPPED TO THE WEST COAST.  OTHER

13  DEFENDANTS WHO WERE PART OF THIS CONSPIRACY SHIPPED SIMILAR

14  SHIPMENTS TO THE WEST COAST, MOST OF WHICH WAS SEIZED BY LAW

15  ENFORCEMENT OFFICIALS BEFORE IT MADE IT TO THE

16  METHAMPHETAMINE LABS.

17        THE FIRST LOAD THAT MR. HADDAD WAS RESPONSIBLE FOR

18  WAS JUNE 1ST OF THE YEAR 2000 WHERE AGENTS OBSERVED

19  MR. NAROG AND CODEFENDANTS ARRIVE AT SEASIDE

20  PHARMACEUTICALS.  A U-HAUL TRUCK WAS PARKED AT A DUNKIN'

21  DONUTS NEAR THE STORAGE FACILITY.

22        MR. EL HADDAD EXITED THE DUNKIN' DONUTS, GOT --

23  I'M SORRY -- YES, MR. HADDAD GOT IN THE U-HAUL AND DROVE

24  TOWARD THE STORAGE FACILITY.  MR. SAMHAN WAS IN THE DUNKIN'

25  DONUTS.  AFTER MR. EL HADDAD LEFT IN THE U-HAUL SAMHAN LEFT

1   THE DUNKIN' DONUTS AND GOT IN THE FORD EXPLORER AND BEGAN

2   DOING COUNTERSURVEILLANCE.

3           WHILE SAMHAN WAS DRIVING AROUND THE AREA EL HADDAD

4   HAD DRIVEN SPECIFICALLY TO THE WAREHOUSE WHERE HE AND A

5   CODEFENDANT MOTLAQ JABER LOADED 200 BOXES OF PSEUDOEPHEDRINE

6   INTO THE BACK OF THE U-HAUL TRUCK.  AS MR. EL HADDAD LEFT

7   THE WAREHOUSE IN THE U-HAUL TRUCK FILLED WITH BOXES OF

8   PSEUDOEPHEDRINE, SAMHAN FOLLOWED TO -- FOLLOWED THE U-HAUL

9   SOUTH TOWARD MIAMI TO A PRIVATE MAIL FACILITY KNOWN AS PAC

10  MAIL IN KENDALL.

11          AT THE PAC MAIL STORE SOME OF THE BOXES WERE

12  REPACKAGED INTO LARGER BOXES FOR EASIER SHIPMENT.  SAMHAN

13  AND EL HADDAD PLACED 15 TO 20 LARGER BOXES INTO THE BACK OF

14  THE EXPLORER.  SAMHAN THEN LEFT AND WENT TO A NEARBY

15  SHOPPING PLAZA WHILE EL HADDAD LEFT THE PAC MAIL IN THE

16  U-HAUL AND TOOK 15 OF THOSE BOXES THAT THEY HAD REPACKAGED

17  TO A FEDERAL EXPRESS OFFICE.

18          A TOTAL OF 495 GROSS POUNDS OF PSEUDOEPHEDRINE WAS

19  SHIPPED FROM THAT FEDERAL EXPRESS OFFICE BY MR. EL HADDAD.

20  THE SHIPMENT WAS SENT TO SALVA AT LA SALVA, INC., LA SALVA

21  BEACH, CALIFORNIA.  THE SENDER WAS LISTED AS SHAVERS PLUS

22  COSMETICS.  THIS LOAD OF PSEUDOEPHEDRINE MADE IT THROUGH TO

23  CALIFORNIA.  AGENTS ESTIMATE THE LOAD VALUED AT $210,000.

24          SINCE THAT ENTIRE SHIPMENT OF PSEUDOEPHEDRINE HAD

25  NOT BEEN SENT, A PORTION HAD BEEN KEPT BY MR. SAMHAN, AGENTS

1  REESTABLISHED SURVEILLANCE AT THE PAC MAIL FACILITY THE NEXT

2  DAY.  AGENTS THEN OBSERVED MR. EL HADDAD LOAD PACKAGES FROM

3  THE PAC MAIL INTO THE BACK OF ANOTHER U-HAUL TRUCK.

4  EL HADDAD THEN DROVE THE U-HAUL TO STERLING TRANSPORTATION

5  WHERE PACKAGES WERE AGAIN SENT TO THE SAME ADDRESS AT LA

6  SALVA, CALIFORNIA.

7        THIS TIME MR. EL HADDAD SENT 22 MORE PACKAGES TO

8  THE SAME ADDRESS IN LA SALVA, CALIFORNIA.  THE TOTAL WEIGHT

9  WAS 902 GROSS POUNDS.  THE VALUE OF THE LOAD WAS ESTIMATED

10 AT $378,000, AND THAT'S A CONSERVATIVE ESTIMATE, YOUR HONOR.

11        WHAT WE ARE DOING IS, WE ARE ASSUMING THAT THE

12 VALUE OF A POUND OF METHAMPHETAMINE IN CALIFORNIA IS $6,000

13 AND IT WAS BEING SOLD OUT THERE.  IF THAT METHAMPHETAMINE

14 WAS SOLD IN THE -- I MEAN IN MIAMI THE VALUE WOULD BE

15 $16,000.  SO MORE THAN DOUBLE THAT.  BUT SINCE THIS WAS OUT

16 IN CALIFORNIA WE ARE USING THAT CONSERVATIVE ESTIMATE.

17        AFTER THAT MR. HADDAD TRAVELED TO CALIFORNIA TO

18 FACILITATE THIS TRANSFER OF THE PSEUDOEPHEDRINE.

19        ON JUNE 7TH OF THE YEAR 2000, EL HADDAD WHO HAD

20 FLOWN TO CALIFORNIA TO FACILITATE THE TRANSPORTATION MET

21 WITH A CONFIDENTIAL INFORMANT IN SAN JOSE, CALIFORNIA.

22 DURING THAT MEETING WITH A CONFIDENTIAL INFORMANT

23 MR. EL HADDAD STATED THAT HE WAS LOOKING FOR THE RAT IN THE

24 ORGANIZATION, REFERRING TO PREVIOUS ARRESTS AND SEIZURES OF

25 PSEUDOEPHEDRINE THAT HAD BEEN MADE ON THE WEST COAST.

1       A SECOND LOAD WAS TRANSFERRED BY MR. EL HADDAD AND

2   MR. SAMHAN TO THE WEST COAST.   ON JUNE 15TH, EL HADDAD AND

3   SAMHAN OBTAINED A SECOND LOAD OF PSEUDOEPHEDRINE FROM NAROG

4   FROM SEASIDE PHARMACEUTICALS.   THE PSEUDOEPHEDRINE WAS

5   DELIVERED BY COMMERCIAL CARRIER TO THE SAME PAC MAIL WHERE

6   EL HADDAD AND SAMHAN THEN MET.

7       AT THE PAC MAIL EL HADDAD AND SAMHAN AGAIN

8   REPACKAGED THE PSEUDOEPHEDRINE INTO 27 LARGER CARDBOARD

9   BOXES.   THE 27 BOXES WERE THEN LOADED INTO A RYDER TRUCK AND

10  DELIVERED BY MR. EL HADDAD TO TARGET LOGISTICS AT THE MIAMI

11  INTERNATIONAL AIRPORT.

12      ON JUNE 19TH, THE 27 BOXES WERE SHIPPED TO SALEM,

13  OREGON.   THE BOXES WERE LABELED AS SHOES BEING SHIPPED TO

14  SAL'S SHOES IN SALEM, OREGON.

15      ON THE 22ND OF JUNE, THREE DAYS LATER,

16  MR. EL HADDAD ARRIVED IN PORTLAND, OREGON.   THAT

17  PSEUDOEPHEDRINE WAS SEIZED BY LAW ENFORCEMENT OFFICIALS IN

18  OREGON BEFORE IT REACHED ITS INTENDED DESTINATION.   A TOTAL

19  VALUE OF 2,300 GROSS POUNDS OF PSEUDOEPHEDRINE WAS SEIZED.

20  THE VALUE OF THAT LOAD WAS $966,000.

21      A THIRD LOAD WAS SHIPPED BY MR. EL HADDAD AND

22  SAMHAN TO THE WEST COAST.   ON JULY 21ST, MR. EL HADDAD AND

23  SAMHAN ARRIVED AND REPACKAGED THE BOXES INTO LARGER BOXES.

24  THE PSEUDOEPHEDRINE HAD BEEN TRANSPORTED AGAIN FROM NAROG'S

25  STORAGE FACILITY TO PAC MAIL BY COMMERCIAL CARRIER THIS

1    TIME.  THOSE BOXES WERE THEN PLACED IN SAMHAN'S EXPLORER AND

2    MR. EL HADDAD'S WIFE'S VAN.  AGENTS ATTEMPTED TO DO

3    SURVEILLANCE BUT THE DRIVERS WERE DOING A LOT OF

4    COUNTERSURVEILLANCE AT THE TIME AND THEY WERE NOT ABLE TO

5    FOLLOW THEM.

6         FOR EXAMPLE, AS THE DEFENDANTS WERE DRIVING TO A

7    RESIDENCE.  INSTEAD OF DRIVING STRAIGHT TO THE RESIDENCE

8    THEY WOULD DRIVE AROUND THE BLOCK THREE OR FOUR TIMES TO

9    MAKE SURE NO ONE WAS FOLLOWING THEM BEFORE THEY WENT TO THE

10   RESIDENCE.

11        A FEW DAYS LATER PART OF THAT SHIPMENT THAT HAD

12   BEEN TAKEN TO PAC MAIL AND WAS SENT TO CALIFORNIA.

13   MR. EL HADDAD ARRIVED IN CALIFORNIA AGAIN TO MAKE CERTAIN

14   THAT THE PSEUDOEPHEDRINE ARRIVED SAFELY.

15        MR. EL HADDAD WAS ARRESTED IN CALIFORNIA WHILE

16   ATTEMPTING TO ASSIST IN THIS LOAD.  AGENTS SEIZED 220 POUNDS

17   IN FIVE BOXES OF LOOSE PSEUDOEPHEDRINE PILLS IN BAGGIES.

18   AGENTS ESTIMATE THAT THE 220 POUNDS CAN BE CONVERTED INTO

19   128 POUNDS OF METHAMPHETAMINE, THE TOTAL VALUE $924,000.

20        MEANWHILE AFTER MR. EL HADDAD WAS ARRESTED IN

21   CALIFORNIA, MR. SAMHAN WAS ARRESTED IN MIAMI.  HE GAVE

22   CONSENT TO SEARCH HIS RESIDENCE.  INSIDE THE RESIDENCE

23   AGENTS DISCOVERED TWO BOXES, EACH WEIGHING 62 POUNDS WITH

24   NOTHING BUT LOOSE PSEUDOEPHEDRINE PILLS.

25        AGENTS ALSO DISCOVERED ANOTHER FOUR BAGGIES EACH

1  WEIGHING FIVE POUNDS OF LOOSE PILLS FOR A TOTAL OF 144

2  POUNDS OF LOOSE PILLS.  AGENTS ESTIMATE THAT THAT 144 POUNDS

3  OF PSEUDOEPHEDRINE CAN BE CONVERTED INTO A HUNDRED POUNDS OF

4  METHAMPHETAMINE, THE TOTAL VALUE IF CONVERTED WOULD BE

5  $600,000.

6          NOW, JUST SO THE COURT IS AWARE AS TO THE AMOUNTS

7  WE ARE TALKING ABOUT -- EXCUSE ME.  I HAVE A BOX HERE

8  WEIGHING 62 POUNDS OF NOTHING BUT PSEUDOEPHEDRINE PILLS.  SO

9  THE COURT IS AWARE THIS IS WHAT THE DEFENDANTS WERE DOING.

10 THEY WERE TAKING THE PILLS OUT OF THE BOTTLES, PLACING THEM

11 IN PLASTIC BAGGIES, PUTTING THEM INTO THESE LARGER BOXES AND

12 THEN SHIPPING THEM TO THE WEST COAST FOR THEM TO BE

13 CONVERTED INTO METHAMPHETAMINE.

14          AGENTS ALSO INTERVIEWED AN EMPLOYEE AT PAC MAIL,

15 ONE OF WHOM ASSISTED IN TAKING THE PILLS OUT OF THE BOTTLES

16 BEFORE SHIPMENT.  THAT EMPLOYEE WAS PAID $200 ON TWO

17 SEPARATE OCCASIONS TO TAKE PILLS OUT OF THE BOTTLES AND

18 PLACE THEM INTO PLASTIC BAGGIES.  THE EMPLOYEES WOULD TAKE

19 THE PILLS OUT OF THE BOTTLES AFTER WORK.  THAT EMPLOYEE

20 INDICATED THAT MR. EL HADDAD SHOWED HIM HOW TO TAKE THE

21 PILLS OUT OF THE BOTTLE BY STICKING A FORK THROUGH THE SEAL

22 IN THE BOTTLE ITSELF, REMOVING THE COTTON, AND THEN DUMPING

23 THE PILLS INTO THE BAGGIES THEMSELVES.

24          MR. EL HADDAD EVEN COMMENTED THAT IT WAS SO EASY

25 HIS CHILDREN DID IT.  WHEN MR. EL HADDAD WAS ARRESTED IN

1   CALIFORNIA HE WAS WITH HIS SISTER-IN-LAW, MARIA CORTEZ.

2   EL HADDAD HAD BEEN CONCERNED ABOUT LAW ENFORCEMENT SEIZING

3   MANY OF THE SHIPMENTS OF PSEUDOEPHEDRINE SO ON THE LAST

4   SHIPMENT HE SHIPPED THE PACKAGE TO HER RESIDENCE IN

5   WATSONVILLE, CALIFORNIA, TO MAKE CERTAIN LAW ENFORCEMENT

6   OFFICIALS WERE NOT FOLLOWING HER.  EL HADDAD TOLD CORTEZ TO

7   FILL HER BACKPACK FULL OF PILLS AND SEE IF ANYONE WAS

8   FOLLOWING HER.

9          AGENTS DID SEE HER WITH A BACKPACK BUT DID NOT

10  STOP HER BECAUSE IT WAS A BACKPACK INSTEAD OF BOXES THAT

11  THEY HAD BEEN USING.  MR. EL HADDAD HAD TOLD CORTEZ THE

12  PILLS WERE TYLENOL AND HE ALSO TOLD HER NOT TO HAVE HER

13  CHILDREN AROUND THOSE PILLS.

14         LAW ENFORCEMENT OFFICIALS ARE AWARE OF THESE THREE

15  SHIPMENTS OF PSEUDOEPHEDRINE BY EL HADDAD AND SAMHAN TO THE

16  WEST COAST.  THE TOTAL AMOUNT OF PSEUDOEPHEDRINE WAS 590

17  POUNDS WHICH WERE ACTUALLY SHIPPED TO THE WEST COAST OF

18  NOTHING BUT PILLS, NOTHING BUT PILLS IN THERE AND ANOTHER

19  150 POUNDS OR 144 POUNDS THAT WERE SEIZED IN SOUTH FLORIDA

20  BEFORE IT WAS SHIPPED.

21         BASED ON AN ESTIMATE OF $6,000 PER POUND OF

22  PSEUDOEPHEDRINE WHEN IT IS CONVERTED, THE VALUE OF THIS

23  WOULD BE 3.1 MILLION DOLLARS.  IF IT WERE SOLD BACK IN MIAMI

24  THE VALUE WOULD BE AT $16,000 A POUND OR CLOSE TO EIGHT

25  MILLION DOLLARS IF SOLD IN FLORIDA.

1          THE DEFENDANT IS A UNITED STATES CITIZEN, BUT HAS

2   TIES TO JORDON.  HE WAS BORN IN JORDON.

3          THE GOVERNMENT WOULD RELY ON THE REBUTTABLE

4   PRESUMPTION IN THIS CASE.  THE AMOUNT OF TIME THAT HE IS

5   FACING, A REFERENCE TO A RAT IN THE ORGANIZATION THAT THEY

6   WERE LOOKING FOR, AND HE ALSO TRAVELED TO CALIFORNIA TO MAKE

7   SURE THAT THE PSEUDOEPHEDRINE MADE IT TO ITS INTENDED

8   DESTINATION.

9          ACCORDINGLY, THE UNITED STATES SUBMITS THAT THE

10  DEFENDANT IS A RISK OF FLIGHT AND DANGER TO THE COMMUNITY

11  AND SHOULD BE HELD IN PRETRIAL DETENTION.

12         THE COURT:  ALL RIGHT.  BEFORE I HEAR FROM

13  MR. SREBNICK, MR. BARDFELD WHAT EXACTLY ARE YOU -- NOT

14  EXACTLY BUT WHAT IS METHAMPHETAMINE.

15         MR. BARDFELD:  IT IS A SCHEDULE TWO SUBSTANCE.

16         THE COURT:  IT IS A SCHEDULE TWO CONTROLLED

17  SUBSTANCE?

18         MR. BARDFELD:  YES.

19         THE COURT:  ALL RIGHT.

20         MR. SREBNICK.

21         MR. SREBNICK:  GOOD MORNING, YOUR HONOR.

22         THE PILLS THAT MR. BARDFELD BROUGHT TO COURT -- IF

23  I MAY.  THIS IS PSEUDOEPHEDRINE.  THIS IS SOMETHING ANYONE

24  OF US CAN GO DOWN THE BLOCK AND BUY A BOTTLE OF IT, AND

25  APPARENTLY THE DRUG MANUFACTURERS WERE SELLING IT TO

1  MR. NAROG TO THE TUNE OF, I THINK, 36,000 TABLETS -- POUNDS.

2  HUGE AMOUNTS.  THIS IS NOT A SUBSTANCE THAT IS ILLEGAL TO

3  POSSESS SO I COMMIT NO CRIME TODAY IN POSSESSING THEM.

4          THE ALLEGATION IS THAT IF ONE SELLS THEM TO

5  SOMEONE DOWN THE ROAD WHO THEN CONVERTS IT TO A CONTROLLED

6  SUBSTANCE IT BECOMES A CRIME TO DO THAT.  SO THAT ALL OF THE

7  POSSESSIONS THAT THE GOVERNMENT MAKES REFERENCE TO IN AND OF

8  THEMSELVES DON'T CONSTITUTE A CRIME BECAUSE THEY ARE NOT

9  CONTROLLED SUBSTANCES.

10         HAVING SAID THAT, I HAVEN'T HEARD A PROFFER MADE

11 THAT THERE ARE -- OTHER THAN THE LARGE QUANTITIES INVOLVED

12 AND THE DRUG MANUFACTURERS WERE SELLING THESE LARGE

13 QUANTITIES TO THESE FOLKS, I DON'T KNOW THAT THE GOVERNMENT

14 HAS PROFFERED ANY EVIDENCE THAT MR. EL HADDAD HAD KNOWLEDGE

15 WHAT THE USE OF THE PILLS WERE GOING TO BE OTHER THAN WHAT

16 I'M SURE THEY ARE GOING TO SAY CIRCUMSTANCE EVIDENCE THE

17 LARGE QUANTITIES, THE SUSPICIOUS NATURE OF THE WAY THEY WERE

18 BEING TRANSPORTED.  BUT I DON'T KNOW THAT THERE WAS ANY

19 EVIDENCE PROFFERED THAT MR. EL HADDAD HAD ANY DIRECT CONTACT

20 WITH ANY METH MAKERS.

21         SO THAT THE ALLEGATION IS, IS THAT HE WAS

22 TRANSPORTING WHAT IS OTHERWISE A LEGAL SUBSTANCE AND THE

23 GOVERNMENT IS SUGGESTING THAT BY CIRCUMSTANTIAL EVIDENCE HE

24 SHOULD HAVE KNOWN THAT THOSE WHO WERE GOING TO RECEIVE THEM

25 WOULD THEN USE THEM TO MAKE A CONTROLLED SUBSTANCE.

1    I WOULD SAY THAT THAT PUTS HIM IN THE SAME

2  CATEGORY AS SQUIBB, OR WHOEVER WAS MANUFACTURING AND SELLING

3  THESE PRODUCTS TO THE SO-CALLED ORGANIZATION.

4    BUT HAVING SAID THAT, THE ISSUE TODAY BEFORE THE

5  COURT IS NOT SO MUCH WHAT THE ALLEGATIONS ARE BUT WHETHER

6  THIS DEFENDANT WILL APPEAR IN COURT AS HE IS GOING TO

7  PROMISE TO DO TODAY.

8    LET ME BEGIN BY INTRODUCING HE AND HIS FAMILY, AND

9  THE COURT HAS HAD AN OPPORTUNITY TO REVIEW OUR MOTION FOR

10  PRETRIAL RELEASE.

11    IN COURT TODAY --

12    I WILL ASK EVERYBODY THAT IS HERE ON BEHALF OF

13  RABAH EL HADDAD TO JUST PLEASE STAND.  AND THERE ARE MORE

14  PEOPLE OUTSIDE, JUDGE.  I BELIEVE THERE ARE YOUNG CHILDREN

15  WHO WE DIDN'T WANT TO BRING INTO THE COURTROOM.

16    YOU CAN ALL SIT DOWN NOW.

17    MR. EL HADDAD IS A U. S. CITIZEN.  WE HAVE

18  ATTACHED A COPY OF HIS PASSPORT TO OUR MOTION.  HIS WIFE IS

19  A U. S. -- BORN U. S. CITIZEN.  ALL OF HIS CHILDREN ARE

20  U. S. CITIZENS.

21    AND I SHOULD SAY, JUDGE, HE -- HE IS THE FATHER OF

22  EIGHT CHILDREN, ONE OF THEM DIED YESTERDAY.  SHE WAS A

23  DISABLED CHILD AND SHE ASPHYXIATED AND WE CONFIRMED

24  YESTERDAY MORNING SHE PASSED AWAY AT DAERING HOSPITAL.  AND,

25  SO WHILE HE WAS IN PRISON OVER THE WEEKEND HE LOST A CHILD

1    WHO WAS ALSO A U. S. CITIZEN.

2         HIS BROTHER IS IN COURT.  HE IS A U. S. CITIZEN.

3    HE IS THE FATHER OF U. S. CITIZENS.  HE -- THE DEFENDANT'S

4    BROTHER BRIEVE SIAE AWAD IS ALSO A U. S. CITIZEN AND LIVES

5    HERE IN SOUTH FLORIDA.  A THIRD BROTHER ISIAD AWAID IS THE

6    BROTHER OF THE DEFENDANT, ALSO A U. S. CITIZEN.  THEY AND

7    THEIR CHILDREN ARE U. S. CITIZENS.  THIS IS A VERY LARGE

8    FAMILY OF SOUTH FLORIDA RESIDENTS.  I HAVE SET THEM FORTH IN

9    OUR PLEADING, ALL U. S. RESIDENTS.

10        UP UNTIL THIS WEEKEND RABAH EL HADDAD, THE

11   DEFENDANT, WAS TH CARE GIVER OF A DISABLED CHILD WHO NOW HAS

12   PASSED AWAY.  THIS FAMILY LIVES HERE IN THE SOUTH FLORIDA

13   AREA.  THE CHILDREN ARE OUTSIDE.  THEY ARE SCHEDULED TO BE

14   IN SCHOOL THIS WEEK.  I HAD TO ASK THEM TO COME TO COURT,

15   AND I REALIZE THEY ARE MISSING SCHOOL BUT IT WAS IMPORTANT

16   THAT THEY BE HERE SO THE COURT KNOWS THAT JUST BECAUSE

17   MR. EL HADDAD HAS A NAME THAT IS OF MIDEAST ORIGIN THESE ARE

18   U. S. CITIZENS JUST LIKE MYSELF, JUST LIKE EVERYBODY ELSE

19   WHO IS A U. S. CITIZEN.

20        HE HAS BEEN IN THIS COUNTRY SINCE 1979.  I AM THE

21   SON OF IMMIGRANTS MYSELF BUT MY PARENTS ARE U. S. CITIZENS

22   JUST AS RABAH EL HADDAD IS A U. S. CITIZEN, NOTWITHSTANDING

23   THAT HE WASN'T BORN IN THIS COUNTRY.

24        ALSO IN COURT TODAY IS ABRAHAM ALVEREZ, THE

25   LANDLORD OF THE GROCERY STORE THAT THE FAMILY OPERATES.  IN

1  COURT LAST WEEK BUT WHO COULDN'T BE HERE BECAUSE OF

2  EMPLOYMENT PROBLEMS WERE MOHAMMED INGBAL, THE OWNER OF THE

3  GAS STATION WHERE THE DEFENDANT IS EMPLOYED, AND A. C.

4  FRANKLIN, ALSO A SOUTH FLORIDA RESIDENT, U. S. CITIZEN, WAS

5  HERE LAST WEEK TO SUPPORT THE BOND.  HE HAD TO WORK TODAY

6  AND COULDN'T TAKE OFF TWO DAYS OF WORK.

7          THE DEFENDANT IS OBVIOUSLY PREPARED TO DO WHATEVER

8  IT TAKES TO SET A BOND.  HE WOULD WAIVE ANY EXTRADITION THAT

9  THE GOVERNMENT WOULD BE CONCERNED ABOUT AS A U. S. CITIZEN.

10  I DON'T THINK THEY WOULD HAVE ANY PROBLEMS IF THAT'S WHAT

11  THEY WERE CONCERNED ABOUT, BUT IN ANY EVENT HE IS PREPARED

12  TO EXECUTE ANY WAIVER FORMS.

13          THERE IS NO MANDATORY MINIMUM IN THIS CASE.  THIS

14  DEFENDANT HAS NO CRIMINAL RECORD.  THERE IS NO HISTORY OF

15  VIOLENCE, NO FIREARMS OR OTHER WEAPONS ARE INVOLVED IN THIS

16  CASE.

17          WHAT I WOULD SUGGEST TO THE COURT, YOUR HONOR,

18  GIVEN HIS FAMILY CIRCUMSTANCES, GIVEN THE NUMBER OF PEOPLE

19  THAT HAVE BEEN IN COURT TODAY, GIVEN THAT THE -- THIS IS NOT

20  A COCAINE CASE, THIS IS NOT MARIJUANA, THIS IS NOT HEROIN,

21  THIS IS NOT A CONTROLLED SUBSTANCE, PER SE, IT IS A

22  PRECURSOR.  THIS IS NOT A SUBSTANCE THAT CARRIES WITH IT A

23  MANDATORY MINIMUM AND, THEREFORE, NOTWITHSTANDING WHAT THE

24  GUIDELINES MAY SUGGEST THE SENTENCES INVOLVED HERE DON'T

25  IMPLICATE THE 10-YEAR MANDATORY MINIMUM THAT THE COURT SEES

19

1   SO FREQUENTLY AND NEVERTHELESS RECEIPTS BONDS IN THOSE

2   CASES.

3            GIVEN THE OVERWHELMING STRENGTH OF TIES TO THIS

4   COMMUNITY, IT IS MY REQUEST THAT YOUR HONOR SET A BOND WITH

5   WHATEVER CONDITIONS THE COURT THINKS IS APPROPRIATE; CURFEW,

6   ELECTRONIC MONITORING IF THE COURT FEELS MORE COMFORTABLE.

7            MY MAIN CONCERN, JUDGE, JUST BECAUSE THIS MAN

8   WAS -- HAS A NAME THAT HAS MIDDLE EASTERN ORIGINS THAT WE

9   NOT HOLD THAT AGAINST HIM SEEING AS THOUGH HE IS A U. S.

10  CITIZEN JUST LIKE THE REST OF US.

11           OTHER DEFENDANTS WERE GRANTED BOND IN THIS CASE,

12  YOUR HONOR, IN THIS INVESTIGATION.  MY RESEARCH REFLECTS

13  FROM DOCKET SHEETS THAT THE TWO CODEFENDANTS IN THIS CASE

14  OUT IN CALIFORNIA, THE ONES ARRESTED WITH THE DEFENDANT

15  BEING CALIFORNIA RESIDENTS, BOTH WERE GRANTED BOND.

16           HE WAS ARRESTED IN CALIFORNIA, AND AS THE COURT

17  KNOWS THE JUDGE THERE DETAINED HIM PENDING HIS RETURN TO

18  FLORIDA WHERE HE COULD PRESENT WITNESSES AND HUMAN BEINGS

19  WHO COULD COME TO COURT.  OBVIOUSLY HE COULDN'T MAKE THAT

20  SHOWING WHEN HIS COURT APPOINTED LAWYER IN CALIFORNIA WENT

21  BEFORE THE COURT.

22           THE DOCKET SHEETS IN THE VARIOUS CASES INVOLVING

23  THIS PSEUDOEPHEDRINE CASE REFLECT THAT A $50,000 10 PERCENT

24  BOND WAS SET FOR A DEFENDANT EL MASRI, A $50,000 PERSONAL

25  SURETY BOND WAS SET AGAINST ANOTHER DEFENDANT, LAST NAME

1   ALMASRI, A $70,000 PERSONAL SURETY BOND FOR DEFENDANT AQUIL,

2   $70,000 PERSONAL SURETY BOND FOR DEFENDANT FNEICHE, $50,000

3   10 PERCENT BOND SET FOR A CODEFENDANT BY THE LAST NAME OF

4   RABEI.  I BELIEVE ONE OF THOSE INDIVIDUALS, FNEICHE, IS A

5   CODEFENDANT IN THIS INDICTMENT.  AND THE OTHER FOLKS HAVE

6   BEEN INDICTED IN OTHER RELATED INVESTIGATIONS IN OTHER PARTS

7   OF THE COUNTRY.

8          IT IS, THEREFORE, CLEAR THAT BONDS HAVE BEEN SET

9   IN THESE CASES, NOTWITHSTANDING THE STAGGERING AMOUNTS

10  INVOLVED.

11         UNDER THOSE CIRCUMSTANCES, YOUR HONOR, UNLESS THE

12  COURT HAS ANY OTHER QUESTIONS I WOULD REQUEST THE COURT SET

13  A 10 PERCENT BOND, LET THE FAMILY POST THE CASH.  THE

14  DEFENDANT'S BROTHER OWNS A HOME IN SOUTH FLORIDA.  HE

15  BOUGHT IT I BELIEVE WITHIN THE LAST YEAR OR TWO.  IT HAS

16  ROUGHLY $25,000 IN EQUITY.  HE IS PREPARED TO SIGN ON THE

17  BOND TOGETHER WITH HIS WIFE ENCUMBER HIS PERSONAL RESIDENCE

18  WHERE HE AND HIS CHILDREN LIVE.

19         EVERY OTHER BROTHER OF HIS, ALL FOUR BROTHERS IN

20  TOTAL, INCLUDING THE DEFENDANT ARE U. S. CITIZENS WILLING TO

21  SIGN THE BAIL.  ONE OF HIS BROTHERS IS A BAIL BONDSMAN

22  WILLING TO ASSIST IN THE PREPARATION OF THE BAIL PACKAGE.

23         YOUR HONOR, UNDER THOSE CIRCUMSTANCES, AND ALSO TO

24  THE EXTENT THE COURT CAN TAKE INTO ACCOUNT THE FACT THAT HE

25  HAS LOST THE CHILD AND WOULD LIKE TO ATTEND THE SERVICES FOR

1  HIS CHILD THIS WEEK, WE WOULD ASK THE COURT TO SET A BOND

2  THAT WOULD PERMIT THIS DEFENDANT TO REMAIN AT HOME PENDING

3  TRIAL.

4        THANK YOU.

5        THE COURT:  I DO HAVE ONE QUESTION, MR. SREBNICK,

6  AND THAT HAS TO DO WITH THE MAXIMUM SENTENCE -- NOT MAXIMUM

7  AS MUCH AS THE ESTIMATE OF GUIDELINES IN THE CASE.

8        I THINK THAT I HEARD FROM MR. BARDFELD 97 TO 121

9  MONTHS.  HAVE YOU CALCULATED IT YOURSELF AND DO YOU HAVE

10  A --

11        MR. SREBNICK:  AS I SEE IT, GIVEN THE QUANTITIES

12  INVOLVED THAT WOULD MAX OUT THE DEFENDANT.  THE STATUTORY

13  MAXIMUM WOULD BE 20 YEARS.  IT IS NOT A LIFE CASE OR A

14  40-YEAR CASE.  THERE IS A ZERO MINIMUM MANDATORY, BUT I DO

15  NOT DISAGREE WITH MR. BARDFELD THAT THE MAXIMUM SENTENCE

16  THAT COULD BE IMPOSED IN THIS CASE FALLS WITHIN THAT

17  GUIDELINE RANGE.

18        THE COURT:  ALL RIGHT.  THANK YOU.

19        MR. BARDFELD, ANY LAST WORD FROM --

20        MR. BARDFELD:  YOUR HONOR, I WOULD SIMPLY SAY THAT

21  BECAUSE OTHER MAGISTRATE JUDGES MAY HAVE MADE MISTAKES, AND

22  WE DID ASK FOR DETENTION ON ALL OF THOSE OTHER DEFENDANTS,

23  DOESN'T MEAN THAT YOU SHOULD DO THE SAME.

24        IT IS OUR POSITION THAT ALL THESE DEFENDANTS

25  SHOULD HAVE BEEN DETAINED.  AS TO THOSE DEFENDANTS ALL OF

1    THEM ARE DEFENDANTS IN THIS PARTICULAR CASE.  THERE WERE A

2    NUMBER OF ARRESTS THAT WERE MADE IN CHICAGO, A NUMBER OF

3    ARRESTS THAT WERE MADE IN TAMPA.

4          THE ONLY ONE THAT HAS A PERSONAL SURETY BOND IS

5    ALMAD ALMASRI, WHICH IS A $50,000 PERSONAL SURETY BOND.  I

6    DON'T THINK MR. SREBNICK COULD GET THIS FROM THE DOCKET

7    SHEETS.  THE TWO OUT OF CHICAGO WHO HAVE $70,000 BOND ARE

8    SECURED BONDS BY THEIR RESIDENCES.  I BELIEVE ONE OF THEM

9    MAY BE MORE THAN 70,000.  I THOUGHT IT WAS LIKE 140, BUT

10   HAVING SAID THEY DID RECEIVE BONDS, I WILL ADMIT THAT.

11         THE COURT:  WELL, I DON'T FIND IT PARTICULARLY

12   USEFUL TO COMPARE DEFENDANTS AND BONDS THAT ARE SET,

13   PARTICULARLY WHEN I DON'T SET THEM, BUT EVEN SOMETIMES WHEN

14   I DO.

15         BUT WHAT ABOUT MR. NAROG, AS LONG AS WE ARE --

16         MR. BARDFELD:  MR. NAROG AND MR. JABER ARE BOTH

17   PRETRIAL DETAINED, AS IS MR. SAMHAN WHO IS A SIMILARLY

18   SITUATED DEFENDANT.

19         THE COURT:  ALL RIGHT.  AND THOSE WERE ON BOND

20   HEARINGS IN THIS DISTRICT?

21         MR. BARDFELD:  YES, THEY WERE.

22         MR. SREBNICK:  I DON'T KNOW IF THEY HAVE TIES TO

23   THE COMMUNITY IN TERMS OF CITIZENSHIP TO THE UNITED STATES.

24         THE COURT:  IT REALLY IS VERY DIFFICULT TO

25   COMPARE.  I AM JUST GOING TO LOOK AT MR. EL HADDAD'S

```
 1    SITUATION AND --

 2          MR. SREBNICK:  AND WE HAVE PRESENTED EMPLOYMENT AS

 3    WELL AT THE --

 4          THE COURT:  YES, AND --

 5          MR. SREBNICK:  -- GAS STATION WHERE HE HAS BEEN

 6    WORKING.  AND I HAVE SPOKEN TO HIS EMPLOYER AND HE IS

 7    PREPARED TO HIM RIGHT BACK TO WORK.  HE WAS IN COURT LAST

 8    WEEK TO SAY THE SAME TO YOUR HONOR.

 9          THE COURT:  ALL RIGHT.  WELL, HAVING AS A COMPLETE

10    PRESENTATION AS I HAVE HAD I AM SATISFIED, FIRST, THAT THE

11    GOVERNMENT HAS PROFFERED SUFFICIENT EVIDENCE WITH RESPECT TO

12    MR. EL HADDAD'S INVOLVEMENT IN THIS CONSPIRACY AND HIS OWN

13    PERSONAL POSSESSION OF WHAT WAS NOT A CONTROLLED SUBSTANCE,

14    PSEUDOEPHEDRINE, BUT WITH SUFFICIENT EVIDENCE, BOTH DIRECT

15    AND CIRCUMSTANTIAL TO SATISFY THIS COURT AT LEAST, THAT

16    MR. EL HADDAD'S PURPOSE IN DOING SO KNOWLEDGEABLY WAS TO

17    MANUFACTURE -- TO PRODUCE METHAMPHETAMINE AS PROFFERED BY

18    THE UNITED STATES.

19          WITH THAT BEING SAID, I RECOGNIZE THAT THIS IS ON

20    THE GOVERNMENT'S SIDE A VERY SERIOUS CHARGE IN THAT THERE IS

21    A SENTENCE OF A MAXIMUM OF 20 YEARS BUT ESTIMATED AT

22    ANYWHERE FROM 97 TO 121 MONTHS WHICH CONVERTS, I BELIEVE

23    CLOSE TO EIGHT TO 10 YEARS AS A MINIMUM -- OR AS A

24    GUIDELINES THAT MIGHT BE IMPOSED SHOULD THERE BE A

25    CONVICTION IN THIS CASE.
```

1          THAT TOGETHER WITH THE TIES OUTSIDE THE COUNTRY

2   GIVE RISE TO THE GOVERNMENT'S CONCERN AS TO A RISK OF

3   FLIGHT, AND I RECOGNIZE THAT AND UNDERSTAND WHAT

4   MR. BARDFELD HAS PRESENTED.

5          ON THE OTHER SIDE, I DO FIND THAT THERE ARE

6   SIGNIFICANT TIES TO THE UNITED STATES, AND I WILL BE

7   FINDING -- BOTTOM LINE OF THIS IS THAT BOND CONDITIONS CAN

8   BE SET WHICH WOULD REASONABLY ASSURE BOTH THE APPEARANCE OF

9   MR. EL HADDAD AT COURT APPEARANCES AND THE SAFETY OF THE

10  COMMUNITY.

11         WITH AT RISK YET OF ANOTHER MAGISTRATE JUDGE

12  MAKING A MISTAKE IN THIS CASE, I WILL BE SETTING A BOND AS

13  FOLLOWS.

14         A $100,000 CORPORATE SURETY BOND WITH A NEBBIA

15  REQUIREMENT.  I DO FIND A CORPORATE BOND IS NECESSARY IN THE

16  CASE IN LIGHT OF THE SERIOUSNESS OF THE CHARGE AND THE

17  CONTINUING TIES OUTSIDE THE UNITED STATES AS REPORTED IN THE

18  PRETRIAL SERVICES REPORT.

19         WITH THAT I AM GOING TO BE REQUIRING A $200,000

20  PERSONAL SURETY BOND THAT WOULD BE CO-SIGNED BY MR. EL

21  HADDAD'S WIFE, THE THREE ADULT BROTHERS, WHOSE NAMES HAVE

22  BEEN MENTIONED AND WHO ARE PRESENT HERE IN COURT, TOGETHER

23  WITH THEIR WIVES, IF MARRIED.  AND I'M PRESUMING AT THIS

24  POINT THAT THEIR WIVES ARE WILLING TO DO SO.  BUT THOSE

25  WOULD BE THE COSIGNERS ON THE BOND, WHICH TOTAL SEVEN; THE

1  WIFE, THREE BROTHERS AND THEIR THREE WIVES IF THEY ARE

2  MARRIED.

3         I WILL FURTHER REQUIRE THE SURRENDER OF ALL TRAVEL

4  DOCUMENTS ISSUED BY THE UNITED STATES, JORDAN, OR ANY OTHER

5  COUNTRIES FOR MR. EL HADDAD, HIS WIFE AND HIS CHILDREN.

6         I WILL SET AND REQUIRE THE WAIVER OF EXTRADITION

7  FROM JORDAN, ALTHOUGH I DON'T KNOW THAT THAT IS PARTICULARLY

8  USEFUL.  IT HAS BEEN OFFERED AND I WILL REQUIRE IT.  WHETHER

9  THAT WOULD BE LEGALLY BINDING OR NOT I DON'T KNOW AT THIS

10  TIME, BUT IT WILL BE A CONDITION OF THIS RELEASE.

11         I WILL FURTHER REQUIRE THAT MR. EL HADDAD WORK AT

12  HIS JOB, IF AVAILABLE TO HIM, AT THE PLACE OF EMPLOYMENT

13  REPORTED IN THE PRETRIAL SERVICES REPORT, THAT HE CONTINUE

14  TO RESIDE AT HIS HOME ADDRESS ON SOUTHWEST 143RD PLACE, THAT

15  HE MAINTAIN A CURFEW.  I DON'T KNOW HIS HOURS OF WORK SO AT

16  THIS TIME I WILL SET IT BETWEEN THE HOURS OF MIDNIGHT AND

17  SIX O'CLOCK A.M. SEVEN DAYS A WEEK WITH ELECTRONIC

18  MONITORING TO BE PAID FOR BY THE DEFENDANT, AND THAT HE

19  REPORT TO PRETRIAL SERVICES ONCE A WEEK IN PERSON AND AS

20  OTHERWISE DIRECTED BY PRETRIAL SERVICES.  IT MAY BE THAT

21  THEY WISH TO HAVE TELEPHONE OR FURTHER REPORTING, BUT A

22  MINIMUM OF ONE TIME A WEEK IN PERSON IS THE ORDER OF THIS

23  COURT, AND AS OTHERWISE DIRECTED BY PRETRIAL SERVICES.

24         I THINK THOSE ARE ALL THE CONDITIONS THAT I HAVE

25  LISTED, BUT I WILL ASK MR. BARDFELD IF HE HAS ANY OTHER

1   REQUESTS OR A REQUEST FOR APPEAL?

2        MR. BARDFELD:  NO, YOUR HONOR, BUT WE ARE GOING TO

3   APPEAL.  IN LIGHT OF THE DEFENDANT'S PERSONAL SITUATION WE

4   WOULD NOT ASK YOU TO STAY THE APPEAL.  IF HE CAN MEET THAT

5   BOND AND ATTEND TO THE FUNERAL AT THIS POINT I THINK IT IS

6   IMPORTANT BUT WE DO INTEND TO APPEAL.

7        THE COURT:  ALL RIGHT.  AND WITH THE MATTER WITH

8   RESPECT TO THE FUNERAL ARE ARRANGEMENTS MADE FOR THAT,

9   MR. SREBNICK, AT THIS TIME THAT YOU KNOW OF?

10       MR. SREBNICK:  WE ARE WAITING TO FIND OUT WHAT THE

11  DEFENDANT'S SCHEDULED WOULD BE.  IF HE IS GOING TO MAKE A

12  BOND WE ARE GOING TO TRY TO SET THE FUNERAL FOR LATER THIS

13  WEEK.

14       THE COURT:  ALL RIGHT.  WELL, I CERTAINLY HOPE

15  UNDER THESE CONDITIONS, AND I DO RECOGNIZE THE COST OF A

16  CORPORATE SURETY BOND, AS I STATED THE REASON WHY I THINK IT

17  IS NECESSARY, BUT I WOULD HOPE THAT -- FIRST OF ALL, NOT

18  MOST IMPORTANTLY, BUT I DO BELIEVE THESE ARE CONDITIONS THAT

19  WOULD REASONABLY ASSURE THE APPEARANCE OF MR. EL HADDAD.

20       I WOULD CERTAINLY HOPE THAT THOSE ARRANGEMENTS CAN

21  BE MADE SO THAT WHATEVER FAMILY ARRANGEMENTS HAVE TO BE MADE

22  FOR HIS APPEARANCE -- OR HIS ATTENDANCE AT THAT EXTREMELY

23  IMPORTANT EVENT CAN BE DONE.

24       MR. SREBNICK:  THANK YOU, YOUR HONOR.

25       THE COURT:  THAT WILL BE THE BOND THAT I SET AT

1    THIS TIME.

2         MR. SREBNICK:  JUDGE, IF I CAN WORK OUT A DEAL

3    WITH CO-COUNSEL -- OPPOSING COUNSEL, WE JUST SUBMIT IT IN

4    WRITING, THE BOND, AND --

5         THE COURT:  YES, THAT WOULD BE FINE.

6         IF THE NEBBIA CAN BE SATISFIED WITHOUT A COURT

7    HEARING, AS MY PRACTICE, IF YOU DISCUSS IT TOGETHER AND IF

8    THE UNITED STATES IS SATISFIED WITH RESPECT TO THE PREMIUM

9    AND THE COLLATERAL FOR THE BOND IT IS NOT NECESSARY TO HAVE

10   A FURTHER HEARING BEFORE ME.  WE JUST NEED TO BE TOLD THAT

11   THERE IS AN AGREEMENT ON THAT, AND I THINK WE REQUIRE THE

12   FILING OF SOMETHING SAYING THAT THE NEBBIA IS SATISFIED BY

13   AGREEMENT OF THE PARTIES.

14        MR. SREBNICK:  WOULD YOUR HONOR CONSIDER -- I

15   REALIZE THE COURT HAS BEEN GENEROUS WITH THE BOND, GIVEN THE

16   COST OF THE CORPORATE SURETY LOWERING THE CORPORATE SURETY?

17   I UNDERSTAND THE NEED FOR IT.

18        THE COURT:  I HAVE CONSIDERED IT, MR. SREBNICK,

19   LOWERED IT TWICE ALREADY SO I WILL LEAVE IT WHERE I GOT IT.

20        MR. SREBNICK:  THANK YOU, YOUR HONOR.

21        THE COURT:  THANK YOU VERY MUCH.

22        I HEAR THE GOVERNMENT IS ANNOUNCING AN APPEAL, BUT

23   I AM NOT STAYING THE BOND AT THIS TIME WITH NO REQUEST BEING

24   MET.

25        MR. BARDFELD:  THANK YOU, YOUR HONOR.

1                                    - - -

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

29

1

2

3              C E R T I F I C A T E

4

5

6   UNITED STATES OF AMERICA

7   SOUTHERN DISTRICT OF FLORIDA

8

9

10          I, **CARL SCHANZLEH**, OFFICIAL COURT REPORTER OF THE

11  UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF

12  FLORIDA, DO HEREBY CERTIFY THAT THE FOREGOING 28 PAGES

13  CONSTITUTE A TRUE TRANSCRIPT OF THE PROCEEDINGS HAD BEFORE

14  THE SAID COURT HELD IN THE CITY OF MIAMI, FLORIDA, IN THE

15  MATTER THEREIN STATED.

16          IN TESTIMONY WHEREOF, I HEREUNTO SET MY HAND ON THIS

17  3RD DAY OF SEPTEMBER, 2000.

18

19                              _____

20                              CARL SCHANZLEH, RPR-CM
                                OFFICIAL FEDERAL COURT REPORTER
21                              299 EAST BROWARD BLVD., 202B
                                FORT LAUDERDALE, FL  33301
22                              TELEPHONE 954/769-5488

23

24

25